IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| FLEET TRUCK SALES, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>CELADON GROUP, INC., QUALITY COMPANIES, LLC, and QUALITY EQUIPMENT LEASING, LLC,<br><br>Defendants. | 8:16CV366<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the Motion for Summary Judgment, ECF No. 67, and the Motion to Exclude, ECF No. 89, filed by Defendants Celadon Group, Inc., Quality Companies, LLC, and Quality Equipment Leasing, LLC (collectively, Defendants). Also before the Court are the Motion for Partial Summary Judgment, ECF No. 79, and Motions to Strike, ECF Nos. 82 and 92, submitted by Plaintiff Fleet Truck Sales, Inc. (Fleet). For the reasons stated below, the Defendants' Motion for Summary Judgment will be granted in part; and Fleet's Motion for Summary Judgment, the Motion to Exclude, and Motions to Strike all will be denied.

## BACKGROUND

Unless otherwise indicated, the following facts are those stated in the Parties' briefs, supported by pinpoint citations to admissible evidence in the record, in compliance with NECivR 56.1[1] and Federal Rule of Civil Procedure 56.

---

[1] *See* NECivR 56.1(b)(1):
The party opposing a summary judgment motion should include in its brief a concise response to the moving party's statement of material facts. The response should address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses,

Fleet entered into two purchase agreements with Quality Equipment Sales for the sale of commercial trucks, one on September 3, 2015, and another on September 9, 2015. Under the first purchase agreement, Fleet agreed to sell Quality Equipment Sales 163 Volvo commercial trucks for $9,454,000 with $81,500 of the purchase price due as a cash deposit. Under the second purchase agreement, Fleet agreed to sell Quality Equipment Sales 169 Peterbilt commercial trucks for $10,309,000 with $84,500 of the purchase price due as a cash deposit. Fleet never received the purchase price on either contract and contends it did not receive either of the respective cash deposits.

Quality Equipment Sales was not, itself, a business entity but the fictitious or assumed name used by other business entities. Defendant Quality Equipment Leasing, LLC, (QEL) was registered[2] to do business under the assumed name of Quality Equipment Sales from January 30, 2008, to November 15, 2011. ECF No. 86-1, Page ID 641, 648-49. Defendant Quality Companies, LLC, (Quality Companies) was registered[3] to do business under the assumed name of Quality Equipment Sales from November 23, 2011, to September 28, 2015. ECF No. 86-1, Page ID 635-38. On September 21, 2015, QEL reassumed the name Quality Equipment Sales and currently does business under that name. There is no evidence that Defendant Celadon Group,

---

deposition testimony (by page and line), or other materials upon which the opposing party relies. <u>Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.</u>

[2] QEL was originally a Delaware corporation and converted to a limited liability company in 2008. It was registered as a foreign limited liability company in the state of Indiana and its sole member is Quality Companies. ECF No. 14.

[3] Quality Companies is registered as a domestic limited liability company in the state of Indiana and is the sole member of QEL. Celadon Trucking Services, Inc., is the sole member of Quality Companies. ECF No. 15.

Inc., has ever registered[4] to do business under the Quality Equipment Sales name. Thus, at the time the purchase agreements were entered into, Quality Companies was registered to do business under the Quality Equipment Sales name.

At relevant times, however, the Celadon website, Celadontrucking.com, included a webpage titled "Equipment Sales" that stated "Quality Equipment Sales was created based on one concept: Quality." ECF No. 81. The page advertised and offered pre-owned equipment sales services, including the selling and leasing of pre-owned tractors and trailers. *Id.* Quality Companies' vice president, Danny Williams, negotiated and authorized the purchase agreements, and although he was not an officer of Celadon Group, his email address was dwilliams@celadontrucking.com. The signature block associated with Williams's email address listed his position as vice president of Quality Companies but also listed the contact information for Celadon Group below. Williams's LinkedIn page also stated his position with Quality Companies, but simultaneously referenced Celadon Group.

Dennis Kosmicki was the Fleet sales representative who solicited Williams to purchase the trucks. Kosmicki had worked with Eric Meek, a Celadon Group representative, around 2006 or 2007 to consummate a purchase agreement for trucks and, for that particular deal, Meek instructed Kosmicki to title the trucks in the name of "Quality Equipment." Kosmicki Depo., ECF No. 81-4, Page ID 407. In 2015, Kosmicki emailed Meek, who was then the Chief Operating Officer for Celadon Group, to solicit interest in another equipment purchase, but Meek referred him to Williams and

---

[4] Celadon Group, Inc., is a Delaware corporation registered as a foreign corporation in the state of Indiana and it is a parent corporation to Celadon Trucking Services, Inc. ECF No. 15.

explained Williams was the new individual in charge of equipment purchases. *Id.* at 408; ECF No. 81-11, Page ID 577. Specifically, Meek responded "I will have Danny [Williams] circle back with you if *we* need any stock." ECF No. 81-11, Page ID 577 (emphasis added). Meek also told Kosmicki that "[Williams] is handling all of *our* purchasing for used/new currently." *Id.* at 576 (emphasis added). Neither Meek nor Williams explained that Williams was an officer of Quality Companies and not Celadon Group. Kosmicki Depo., ECF No. 81-4, Page ID 408.

Kosmicki and Williams proceeded to enter into two purchase agreements between Fleet and Quality Equipment Sales, one in March 2015 and one in May 2015. Payment was made on these purchase orders by Celadon Trucking Services, Inc. ECF Nos. 81-20 & 81-6, Page ID 442. Thereafter, both Kosmicki and Williams coordinated the finalization of the two September purchase agreements at issue in this litigation. Although Kosmicki worked with Williams directly to finalize the purchase agreements, Kosmicki did not have the authority to enter into such contracts for Fleet. He had to get approval from his immediate supervisor, Larry Lamer. Kosmicki Depo., ECF No. 81-4, Page ID 407.

Quality Companies ultimately was unable to secure financing for the September 3 and September 9 purchase agreements, but for the remainder of 2015 Williams continued to assure Fleet that both purchase agreements would be honored. ECF No. 81-13; ECF No. 81-18; ECF No. 81-31; ECF No. 81-33. On January 13, 2016, however, Williams sent Kosmicki an email explaining that Quality Companies had not resolved its financing problems and recommending that Fleet sell the trucks subject to the September purchase orders to other buyers. ECF No. 81-19. As a result, Fleet

4

began making efforts to sell the trucks to other potential buyers and initiated this action for breach of contract. Both parties have moved for summary judgment on multiple issues.

## STANDARD OF REVIEW

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881, 884 (8th Cir. 2016) (citing Fed. R. Civ. P. 56(c)). "Summary judgment is not disfavored and is designed for every action." *Briscoe v. Cty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc)). In reviewing a motion for summary judgment, the Court will view "the record in the light most favorable to the nonmoving party . . . drawing all reasonable inferences in that party's favor." *Whitney v. Guys, Inc.*, 826 F.3d 1074, 1076 (8th Cir. 2016) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 923–24 (8th Cir. 2004)). Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 618 (8th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The moving party need not produce evidence showing "the absence of a genuine issue of material fact." *Johnson v. Wheeling Mach. Prods.*, 779 F.3d 514, 517 (8th Cir. 2015) (quoting *Celotex*, 477 U.S. at 325). Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's

case." *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325).

In response to the moving party's showing, the nonmoving party's burden is to produce "specific facts sufficient to raise a genuine issue for trial." *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Wagner v. Gallup, Inc.*, 788 F.3d 877, 882 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1042). "[T]here must be more than the mere existence of some alleged factual dispute" between the parties in order to overcome summary judgment. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Vacca v. Viacom Broad. of Mo., Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989)).

In other words, in deciding "a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Wagner*, 788 F.3d at 882 (quoting *Torgerson*, 643 F.3d at 1042). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue of material fact" for trial and summary judgment is appropriate. *Whitney*, 826 F.3d at 1076 (quoting *Grage v. N. States Power Co.-Minn.*, 813 F.3d 1051, 1052 (8th Cir. 2015)).

## DISCUSSION

**I. Liquidated Damages**

The Parties agree that the primary issue is whether Fleet's damages are, as a matter of law, limited by the liquidated damages clause in each of the September purchase agreements. Fleet argues the purchase agreements give it the option to pursue actual damages or to enforce the liquidated damages clause. Defendants argue Fleet's only option with respect to damages is enforcement of the liquidated damages clause. This issue is one of contract interpretation.[5]

"The interpretation of a contract and whether the contract is ambiguous are questions of law." *Timberlake v. Douglas Cty.*, 865 N.W.2d 788, 793 (Neb. 2015). Thus, "[i]n interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous." *Facilities Cost Mgmt. Grp., LLC v. Otoe Cty. Sch. Dist. 66-0111*, 868 N.W.2d 67, 74 (Neb. 2015). "A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings," and "[t]he meaning of an ambiguous contract is generally a question of fact." *Id.* at 74-75. "A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms." *Kluver v. Deaver*, 714 N.W.2d 1, 5 (Neb. 2006). A contract must also be read "as a whole, and if possible, effect must be given to every part of the contract." *Id.*

The purchase agreements are, in all relevant respects, identical. Each is a two page document with a "**NOTICES TO PURCHASER**" section at the bottom of the first

---

[5] Defendants do not argue that it is impermissible under Nebraska law for a contract to provide a non-breaching party the option to pursue either actual or liquidated damages. Defendants argue that the purchase agreements at issue unambiguously restrict Fleet to pursuing liquidated damages. *See, e.g.*, *Hahn v. Int'l Mgmt. Servs., Inc.*, 298 N.W.2d 140, 142 (Neb. 1980) ("The liquidated damages provision was optional with the seller and the record shows the seller sought the actual damages resulting from the breach instead of liquidated damages.").

7

page and a "**Purchaser's Certification & Terms of Sales**" section that is the entirety of the second page. ECF No. 81-10, Page ID 570-73. The liquidated damages provision is found in the second paragraph on the second page of the Terms of Sales section and states:

> The parties agree that it would be impractical and extremely difficult to determine the actual damages in the event of a breach by either party. Thus, the parties agree that liquidated damages in an amount equal to the Cash Deposit shall be paid by either party who breaches this contract. The parties agree that this amount is a reasonable estimate of any actual damages. Purchaser understands and agrees that in the event Purchaser breaches this Agreement, Seller shall retain the Cash Deposit as liquidated damages.

*Id.* The liquidated damages provision is preceded by the following statement in the Notices to Purchaser section on the first page: "*PURCHASER'S CASH DEPOSIT MAY BE RETAINED BY SELLER AS LIQUIDATED DAMAGES PURSUANT TO PARAGRAPH 2 ON PAGE 2.*" *Id.* Reading the purchase agreement contracts as a whole, the Court finds they are unambiguous with respect to liquidated damages. *See Boyles v. Hausmann*, 517 N.W.2d 610, 615 (Neb. 1994) ("[T]he fact that the parties have suggested opposing meanings of the disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous.").

Fleet suggests that use of the word "may" in the Notices to Purchaser section means that Fleet may, in its discretion, keep the cash deposit as liquidated damages, or may pursue an action for actual damages. *See Childers v. Conservative Sav. & Loan Ass'n*, 429 N.W.2d 325, 327-28 (Neb. 1988) (finding that the use of the word "may" in the contract at issue was "permissive or discretionary" language, not "mandatory"); *Sieford v. Hous. Auth. of City of Humboldt*, 223 N.W.2d 816, 823 (Neb. 1974)

8

(explaining the word "may" indicates "permissive, and not mandatory," language); *accord Bahnmaier v. N. Utah Healthcare Corp.*, 402 P.3d 796, 800 (Utah Ct. App. 2017) (quoting *Holmes Dev., LLC v. Cook*, 48 P.3d 895, 902-03 (Utah 2002) ("The plain, ordinary, and accepted meaning of the word 'may' is permissive or discretionary, generally indicating that an individual is either permitted or has a possibility to do something") (internal quotations omitted).

While the Court agrees that the word "may" implies permissive or discretionary action, Fleet's suggested interpretation is inconsistent with a plain reading of the September purchase agreements as a whole. If either party breaches the September purchase agreements, that party "shall" pay the non-breaching party "liquidated damages in an amount equal to the Cash Deposit." Under the agreements, Fleet "may" retain the Purchaser's cash deposits as liquidated damages in the event of a breach by Purchaser, or Fleet may give the cash deposits back, in whole or part. That is Fleet's choice, and the Purchaser acknowledges and agrees it has no say in the matter. Further, based on the quoted language above, Fleet's suggestion that the word "retain" requires payment of the cash deposits as a condition precedent to enforcement of the liquidated damages clause is also inconsistent with a plain reading of the September purchase agreements. The language of the liquidated damages provision is mandatory and unambiguous, and Fleet has no right to pursue a claim for actual damages under the September purchase agreements.

## II. Fleet's Claim for Breach of an Oral Contract

Fleet argues that Defendants also breached an oral contract with Fleet. According to Fleet, "the oral agreement between the parties relates to Fleet holding

trucks for Defendants for over four months while the used truck market was declining." Pl.'s Br. Mot. Summ. J., ECF No. 80, Page ID 349. Fleet identifies Williams's assurances that payment on the September purchase agreements was forthcoming as a promise giving rise to an independent oral contract. *Id.* at 349-50. This claim must be dismissed because the alleged oral contract lacked consideration and no oral contract was formed, as a matter of law.

"[C]onsideration is an essential element to the validity of a contract." *Irwin v. West Gate Bank*, 848 N.W.2d 605, 610 (Neb. 2014) (quoting *Middagh v. Stanal Sound Ltd.*, 382 N.W.2d 303, 307 (Neb. 1986)). "[T]he question of consideration" depends on "whether, as a matter of law, the promisee suffered a detriment or did anything which he was not otherwise required to do . . . . *Kissinger v. Genetic Evaluation Ctr., Inc.*, 618 N.W.2d 429, 436 (Neb. 2000). Consideration is lacking where the "promisor is receiving a benefit . . . that he is already entitled to receive, and the promisee is parting with what she . . . is already required to part with." *Id.*

Here, Fleet's promise to refrain from selling the trucks that were subject to the September purchase orders and Williams's reassurances that payment was forthcoming was the same consideration supporting the September purchase agreement contracts. Under the September purchase agreements, Fleet already had an obligation to reserve the trucks and Quality Equipment Sales already had an obligation to pay for them. Thus, Fleet's claimed oral contract is not supported by any legal detriment by either party that did not already exist under the September purchase agreements.

Fleet contends that its forbearance from reselling the trucks subject to the purchase agreements was sufficient consideration to support an independent oral

contract. However, the purchase agreements did not provide a time for performance of the payment obligations and the evidence shows that Fleet treated the purchase agreement contracts as executory until January 13, 2016, when Williams confirmed the payments would not be made. Goff Depo., ECF No. 522-23. Thus, Fleet's claim for breach of an oral contract will be dismissed.

### III. Parties to the September Purchase Agreements

The Parties agree Quality Companies was a party to the September purchase agreement contracts. Fleet, however, contends there is a factual dispute about whether, at the time the September purchase agreements were entered into, QEL, and Celadon Group were also doing business under the Quality Equipment Sales name, making each of them additional parties to the contracts. Alternatively, Fleet contends that QEL and Celadon Group were made parties to the September purchase agreements because Williams was a common agent of Defendants with apparent authority to enter into the contracts on each of their behalves, collectively.

In Nebraska, a business entity that does business under another, assumed or fictitious, name is liable for the contractual obligations it incurs under that name. *Duval v. Midwest Auto City, Inc.*, 425 F. Supp. 1381, 1387 (D. Neb. 1977). There is no evidence that QEL was using the Quality Equipment Sales name on September 3, or September 9, 2015.[6] As to Celadon Group, it has never registered to do business as Quality Equipment Sales, but Fleet relies heavily on the fact that one of Celadontrucking.com's internal webpages stated "Quality Equipment Sales was created

---

[6] Fleet's argument that QEL and Quality Companies were indistinguishable business entities is more appropriately addressed under Fleet's alter ego, veil-piercing theory of liability discussed below.

based on one concept: Quality." Pl.'s Br. Mot. Summ. J., ECF No. 80, Page ID 341 ("Celadon's webpage establishes that it was doing business as Quality Equipment Sales . . . ."); ECF No. 81. Fleet also relies on its assertion that Celadon Group instructed Fleet to use the Quality Equipment Sales name on a purchase agreement several years ago; however, the evidence shows Fleet was not instructed to do so. Kosmicki Depo., ECF No. 81-4, Page ID 407 (stating he was "advised to title the equipment in the name of Quality Equipment," not Quality Equipment Sales). Thus, the only evidence supporting Fleet's contention that Celadon Group held itself out as doing business under the Quality Equipment Sales name is the above statement on a Celadontrucking.com webpage and there is no evidence that the website was exclusive to Celadon Group.[7] No rational trier of fact could find, based on this evidence, that Celadon Group, specifically, was holding itself out and doing business as Quality Equipment Sales.[8]

An agency relationship arises where "the principal 'manifests assent' to the agent that the agent will 'act on the principal's behalf and subject to the principal's control[,]' and the agent "consents so to act." *RM Campbell Indus., Inc. v. Midwest Renewable Energy, LLC*, 886 N.W.2d 240, 251 (Neb. 2016) (quoting *Koricic v. Beverly Enters.— Neb., Inc.*, 773 N.W.2d 145, 150 (Neb. 2009). The relationship "may be implied from the words and conduct of the parties and the circumstances of the case evidencing an

---

[7] There is evidence that other associated business entities had "Celadon" in their name, like Celadon Trucking Services, Inc. ECF No. 15.

[8] The Court also notes that the Parties' course of dealing contradicts Fleet's argument that QEL and Celadon Group, Inc., were parties to the September purchase agreements. The March and May purchase agreements were paid for by Celadon Trucking Services, Inc., which has not been named as a defendant in this case. ECF No. 81-20.

intention to create the relationship irrespective of the words or terminology used by the parties to characterize or describe their relationship." *RM Campbell Indus.*, 886 N.W.2d at 251-52.

"Apparent authority is authority that is conferred when the principal affirmatively, intentionally, or by lack of ordinary care causes third persons to act upon an actor's apparent authority." *Kohout v. Bennett Constr.*, 894 N.W.2d 821, 828 (Neb. 2017). An agent's "power to affect the principal's legal relationships with third parties[,]" through apparent authority, "arises from, and is limited to, the principal's manifestations to those third parties about the relationships." *Id*. Thus, "apparent authority for which a principal may be liable exists only when the third party's belief is traceable to the principal's manifestation and cannot be established by the actor's acts, declarations, or conduct." *Id*. The third party's belief that an agent is apparently acting with proper authority must also be reasonable. *Koricic*, 773 N.W.2d at 152. Whether an agency relationship exists and whether an agent had the apparent authority to act on the principal's behalf are factual questions. *Id*. at 149, 152.

Although Fleet argues Williams was a common agent for Defendants with apparent authority to enter into purchase agreements on each of their behalves, there is no evidence that Fleet actually believed it was contracting with, and Williams was acting for, all three business entities simultaneously. *See Kohout*, 894 N.W. 2d at 829 (finding third-party did not actually believe he had contracted with the principal); *see also* 12 Williston on Contracts § 35:21 (4th ed.) ("A party that deals with an agent must prove . . . that it believed the agent was acting within the scope of its authority."). In fact, the language of the September purchase agreements suggests otherwise. Paragraph 7 of

13

the Terms of Sales section in each purchase agreement affirmatively states Williams had the authority to act on behalf of one entity, Quality Equipment Sales. Even if Fleet did actually believe Williams was acting with apparent authority to make Defendants parties to the September purchase agreements, collectively, no rational trier of fact could find that such a belief was reasonable. Thus, Fleet's contention that Williams was a common agent acting with apparent authority for all three Defendants, collectively, is not supported by the language of the purchase agreements or any other evidence.[9]

However, based on Kosmicki's email correspondence with Meek, the Chief Operating Officer for Celadon Group, ECF No. 81-11, Page ID 576-77, there is evidence upon which a rational trier of fact could find that Fleet reasonably believed Williams had the authority to enter into the September purchase agreements on Celadon Group's behalf. When Kosmicki solicited Meek's interest in purchasing trucks, Meek referred him to Williams stating Williams "is handling all of *our* purchasing for used/new currently." *Id.* at 576 (emphasis added). Although the September purchase agreements state Williams had the authority to contract for Quality Equipment Sales, this evidence raises a factual question as to whether Fleet reasonably believed Williams had the authority to, and was actually acting on behalf of, Celadon Group.[10] With

---

[9] The Court notes there is no dispute that Williams had the actual authority to enter into the September purchase agreements for Quality Companies as its vice president.

[10] The other evidence Fleet relies on—Williams's email domain (dwilliams@celadontrucking.com) and signature block, Williams's LinkedIn profile, and Celadontrucking.com's senior management list—do not support a finding of apparent authority. Email address domains and email signature blocks are not sufficient to support a finding of apparent authority, on their own. *Airline Support, Inc. v. ASM Capital II, L.P.*, 279 P.3d 599, 608 (Alaska 2012) (citing *CSX Transp., Inc. v. Recovery Express, Inc.*, 415 F. Supp. 2d 6 (D. Mass. 2006) (email domain); *Lynn v. Romar Marina Club, LLC*, Civil Action No. 07-0173-KD-C, 2009 WL 4667387, at *21 (S.D. Ala. Dec. 1, 2009) (email signature block). Williams's personal LinkedIn profile does not support a finding of apparent authority because it is evidence of Williams's own

respect to QEL, Fleet has not identified a manifestation, traceable to QEL, that suggested Williams had the authority to contract on QEL's behalf.

The Court will grant Defendants' Motion for Summary Judgment, in part, and dismiss QEL from this action. Celadon Group will not be dismissed, however, because there is a question of fact as to whether Williams was acting with the apparent authority to make Celadon Group a party to the September purchase agreements.

## IV. Alter Ego Theory of Liability

Fleet also seeks to hold QEL and Celadon Group liable for any damages it may be entitled to receive based on an alter ego theory of liability.[11]

"State law is viewed to determine whether and how to pierce the corporate veil." *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 649 (8th Cir. 2003). The Nebraska Supreme Court has explained that "in equity, the corporate entity may be disregarded and held to be the mere alter ego of a shareholder or shareholders in various circumstances where necessary to prevent fraud or other injustice." *Medlock v. Medlock*, 642 N.W.2d 113, 124 (Neb. 2002). Similarly, a limited liability company's identity may be disregarded and the members held liable for its debts "only where the company has been used to commit fraud, violate a legal duty, or perpetrate a dishonest

---

representations, not of a manifestation from Celadon Group, Inc. *See Kohout*, 894 N.W.2d at 828 (apparent authority must be based on manifestations from the principal, not the declarations of the purported agent). Nor is the senior management list on Celadontrucking.com, which lists Williams as the vice president of Quality Companies, LLC, evidence of apparent authority because the list is from October 2016, over a year after the September purchase agreements were signed. 12 Williston on Contracts § 35:21 (4th ed.) (a third party cannot support its claim of apparent authority with "later-discovered facts"); Wischnowski Decl., ECF No. 81-2, Page ID 361. There is also no evidence that Celadon Group, Inc., managed or controlled Williams during the negotiation and finalization of the purchase agreement contracts.

[11] "[P]iercing the corporate veil under an alter ego theory is best thought of as a remedy to enforce a substantive right, and not as an independent cause of action." *Tamko Roofing Prods., Inc. v. Smith Eng'g Co.*, 450 F.3d 822, 826 n.2 (8th Cir. 2006).

or unjust act in contravention of the rights of another." *Thomas & Thomas Court Reporters, L.L.C. v. Switzer*, 810 N.W.2d 677, 686 (Neb. 2012). Thus, neither a corporation's nor a limited liability company's identity will be disregarded unless the plaintiff demonstrates such equitable action from the court is necessary to prevent a fraud or injustice to the plaintiff. *Id*.

With respect to QEL, Fleet has failed to demonstrate that holding QEL to be the alter ego of Quality Companies is necessary to prevent any particular fraud or injustice to Fleet. Fleet has also failed to provide evidence that QEL "was under the actual control" of Quality Companies. *Christian v. Smith*, 759 N.W.2d 447, 462 (Neb. 2008). Although there is evidence that Quality Companies and QEL provided similar services and shared officers, this evidence is insufficient to justify the equitable remedy of disregarding Quality Companies' identity. *See Global Credit Servs. v. AMISUB*, 508 N.W.2d 836, 842 (Neb. 1993) (explaining "a plaintiff must show more than the mere sharing of services" and officers).

It is unnecessary at this time to address the merits of Fleet's arguments regarding Celadon Group's corporate veil, because Celadon Group may be directly liable for breach of the September purchase agreement contracts based on Fleet's theory of apparent authority. Nevertheless, Fleet has not identified any fraud or injustice that would result unless the Court finds Quality Companies to be the alter ego of Celadon Group. Nor has Fleet provided any evidence that Celadon Group actually controlled Quality Companies. *Christian*, 759 N.W. 2d at 462. The Court will, therefore, grant summary judgment in favor of Defendants on Fleet's alter ego, veil-piercing theory of liability.

**V. Evidentiary Motions**

    A. Fleet's Motions to Strike

Fleet's first Motion to Strike, ECF No. 82, asks the Court to strike two statements from Williams's affidavit that assert "Quality [Companies] and Fleet fully performed" the March and May purchase orders because these statements are impermissible legal conclusions. Williams Aff., ECF No. 68-2, Page ID 184. Its second Motion to Strike, ECF No. 92, asks the Court to strike Dennis Elschide's affidavit, ECF No. 86-1, because Defendants failed to disclose him as a witness under Fed. R. Civ. P. 26(a), and because his statements lack foundation.

    The Court will deny Fleet's Motions to Strike. Williams's statements were not material to deciding the Parties' summary judgment motions and Defendants' failure to disclose Elschide as a witness under Rule 26(a) was harmless. *See* Fed. R. Civ. P. 37(c)(1); *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008). Elschide's affidavit lays foundation for the Indiana Secretary of State's records showing each Defendants' state of organization and official registration of the Quality Equipment Sales name, which are all public records maintained on the Indiana Secretary of State's website. As such, the information in the affidavit was readily available to Fleet regardless of Defendants' failure to disclose Elschide as a witness. The Motion to Strike Elschide as a witness, however, is subject to reassertion if Defendants seek to procure testimony at trial regarding matters beyond those included in his affidavit.

    B. Quality Companies' Motion to Exclude

The Objection and Motion to Exclude, ECF No. 89, will be denied for failure to comply with the Court's local rules. *See* NECivR 7.1(a)(1) & (c). The Motion was

submitted without an accompanying brief, and although Defendants submitted a reply brief to Fleet's response, the reply was submitted out of time.

## CONCLUSION

The Parties' Motions for Summary Judgment will each be granted, in part. Fleet is limited to seeking liquidated damages under the September purchase agreements, and may not recover actual damages in excess of the liquidated damages agreed upon in the September purchase agreements. Fleet's claim for breach of an oral contract will be dismissed.

Celadon Group will not be dismissed from this action, because there is a factual question as to whether Fleet reasonably believed Williams was acting with the apparent authority to make Celadon Group a party to the September purchase agreements. QEL, however, will be dismissed from this action. The Parties' evidentiary motions will be denied.

Accordingly,

IT IS ORDERED:

1. The Motion for Summary Judgment, ECF No. 67, filed by Defendants Celadon Group, Inc., Quality Companies, LLC, and Quality Equipment Leasing, LLC, is granted, in part, as follows:

    a. Plaintiff Fleet Truck Sales, Inc., is limited to seeking liquidated damages under the September purchase agreements;

    b. Quality Equipment Leasing, LLC, is dismissed from this action;

    c. Plaintiff Fleet Truck Sales, Inc.'s, claim for breach of oral contract is dismissed, with prejudice;

    d. Plaintiff Fleet Truck Sales, Inc., is not entitled to the equitable remedy of piercing the corporate veil;

The Motion is otherwise denied;

2. The Motion for Partial Summary Judgment, ECF No. 79, filed by Plaintiff Fleet Truck Sales, Inc., is denied;

3. The Motions to Strike, ECF Nos. 82 & 92, filed by Plaintiff Fleet Truck Sales, Inc., are denied; and

4. The Motion to Exclude, ECF No. 89, filed by Defendants is denied.

Dated this 3rd day of January, 2018.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge